## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | |
|---|---|
| **KRISTOPHER SWAIN,**       ) | |
| ) | |
|     **Plaintiff,**     ) | |
| ) | |
| **v.**                 ) | **Case No.: 1:10-CV-2941-VEH** |
| ) | |
| **PRECISION STRIP, INC.,**    ) | |
| ) | |
|     **Defendant.**    ) | |

_____

## <u>MEMORANDUM OPINION</u>

## I.   INTRODUCTION

Plaintiff Kristopher Swain ("Mr. Swain") initiated this job discrimination lawsuit arising under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981 against Defendant Precision Strip, Inc. ("Precision") on November 1, 2010. (Doc. 1). Pending before the court are Precision's Motion for Summary Judgment (Doc. 19) (the "Rule 56 Motion") filed on October 5, 2011, and its Motion to Strike Inadmissible Hearsay Testimony (Doc. 24) (the "Hearsay Motion") filed on November 8, 2011.  Precision filed all of its materials in support of its Rule 56 Motion on October 5, 2011.  (Docs. 20-21).

Mr. Swain filed his initial opposition brief to summary judgment (Doc. 22) on

October 27, 2011.  Mr. Swain filed a second opposition[1] (Doc. 25) on December 21, 2011, which the court struck (Doc. 28) on December 29, 2011, on the grounds of substantial untimeliness.

Both motions are now under submission, and, for the reasons explained below, the Rule 56 Motion and the Hearsay Motion are both due to be granted.

## II.   FACTUAL BACKGROUND[2]

Precision is in the business of cutting, slitting, processing and shipping metal coils such as steel and aluminum to meet customer specifications in areas such as the

---

[1]   This second opposition by Mr. Swain purported to respond to both Precision's Rule 56 Motion and the Hearsay Motion.

[2]   Keeping in mind that when deciding a motion for summary judgment the court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion, the court provides the following statement of facts. *See Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1241 (11th Cir. 2007) (observing that, in connection with summary judgment, a court must review all facts and inferences in a light most favorable to the non-moving party). This statement does not represent actual findings of fact.  *See In re Celotex Corp.*, 487 F.3d 1320, 1328 (11th Cir. 2007).  Instead, the court has provided this statement simply to place the court's legal analysis in the context of this particular case or controversy.  These facts are taken from Precision's narrative summary of undisputed facts (*see* Doc.  20 ¶¶ 1-24), which Mr. Swain has not opposed..  Instead, Mr. Swain has offered his own statement of facts without any citations to the record.  (Doc. 22 ¶¶ 1-21).  Mr. Swain's efforts in opposing summary judgment are inconsistent with the requirements of Appendix II of the court's uniform initial order entered on November 24, 2010.  (Doc. 7 at 17- 18) (detailing parameters of opposing party's statement of facts).

automotive and appliance industries.  AF No. 1.1.[3]  Precision operates a 340,000 square foot facility in Talladega, Alabama.  AF No. 1.2.

Precision hired Mr. Swain on January 9, 2006, as an entry level Bander at its Talladega plant.  AF No. 2.1.  A Bander is responsible for identifying, tagging, and banding the metal coils as they come off the line.  AF No. 2.2.

In April 2007, Mr. Swain accepted a lateral move to the position of Material Handler.  AF No. 3.1.  A Material Handler is responsible for measuring metal coils and using a crane to move the coils to the coil field for storage, shipping, and processing.  AF No. 3.2.  Mr. Swain held this position until June 8, 2008, when he was moved back to the Bander position on Line 802 due to poor performance and repeated safety violations.  AF No. 3.3.  On August 3, 2009, Line 802 was shut down and, as such, Mr. Swain was returned to his position as Material Handler.  AF No. 3.4.

---

[3]  "AF" stands for admitted fact stands for and indicates a fact offered by the Precision that Mr. Swain has admitted in his written submissions on summary judgment, in his deposition testimony, or by virtue of any other evidence offered in support of his case.  Whenever Mr. Swain has adequately disputed a fact offered by the Precision, the court has accepted Mr. Swain's version. The court's numbering of admitted facts (*e.g.*, AF No. 1) corresponds to the numbering of the Precision's statement of facts as set forth in Doc.  20.  A number following a decimal point corresponds to the particular sentence within the numbered statement of facts.  For example, (AF No. 1.2) would indicate the second sentence of paragraph 1 of Precision's statement of facts is the subject of the court's citation to the record.

Mr. Swain's immediate supervisors were Corey Miller ("Mr. Miller"), Production Leader (Caucasian), and Matthew Jenkins ("Mr. Jenkins"), Production Supervisor (Caucasian). AF No. 4.1. Brian Rismiller ("Mr. Rismiller") (Caucasian) was the Operations Manager during Mr. Swain's employment. AF No. 4.2.

In June 2006, Precision held a company-wide picnic for employees, management, and their families at a local park. AF No. 5.1. Approximately 225 employees and their family members were present. AF No. 5.2. Mr. Swain and his wife, Michelle Swain (Caucasian) ("Mrs. Swain"), attended this picnic with their children. AF No. 5.3. Neither Mr. Swain nor his wife spoke to Mr. Rismiller at the picnic. AF No. 5.4.

On October 23, 2006, Mr. Swain was given a verbal warning from Mr. Rismiller regarding his inefficiency and performance. AF No. 6.1. Mr. Swain was advised that he needed to be more efficient and pay closer attention to his work. AF No. 6.2.

On August 2, 2007, Mr. Swain was given a written warning from Mr. Rismiller for not wearing his safety gloves while working in the company's coil field. AF No. 7.1. This written warning references that Mr. Swain had already been given several verbal warnings for not wearing his gloves. AF No. 7.2. Mr. Swain was notified that failure to follow company safety policies in the future could result in further

disciplinary action, up to and including termination.  AF No. 7.3.

On October 4, 2007, Mr. Swain was given another written warning from Mr. Rismiller for poor performance and quality violations.  AF No. 8.1.  Mr. Swain was informed that he was expected to follow all quality and safety procedures and that anything short of that could result in further disciplinary action, including termination.  AF No. 8.2.  On March 21, 2008, Mr. Swain was placed on a 90-day Performance Improvement Plan by Mr. Miller in order to improve in the areas of quality, work habits, safety, and teamwork.  AF No. 9.

On June 26, 2008, Mr. Miller suspended Mr. Swain for one day after spilling materials in the plant.  AF No. 10.1.  This incident was the second spilled material incident caused by Mr. Swain in a week.  AF No. 10.2.  Mr. Swain was informed that working safely was a condition of his employment and that further incidents could result in additional disciplinary action, including termination.  AF No. 10.3.

On September 4, 2008, Mr. Miller placed Mr. Swain on an Attendance Improvement Plan based on his repeated attendance infractions.  AF No. 11.  Mr. Swain was given a verbal warning by Mr. Miller on October 23, 2008, for failing to complete his housekeeping tasks and responsibilities prior to the end of his shift.  AF No. 12.

On February 6, 2009, Mr. Swain was given another verbal warning by Mr.

5

Miller and Mr. Jenkins for poor performance and failure to comply with quality policies and procedures.  AF No. 13.  Mr. Swain receive another verbal warning from Mr. Miller on September 14, 2009, for failing to categorize the metal being processed and for failing to properly break down the coils even after being repeatedly asked to do so.  AF No. 14.

On September 30, 2009, Mr. Rismiller observed Mr. Swain in the coil field without wearing his safety gloves.  AF No. 15.1.  Mr. Rismiller informed Mr. Swain that he was suspended pending investigation into the safety violation.  AF No. 15.2.

Safety gloves are a required piece of personal protective equipment and must be worn by employees working in or walking through the coil field.  AF No. 16.1. The coil field is filled with hundreds of metal coils each weighing upwards of 50,000 pounds.  AF No. 16.2.  Employees working in or walking through the coil field are required to wear their safety gloves in order to protect them from being cut and severely injured by the razor sharp metal present throughout the coil field.  AF No. 16.3.

Following the suspension, Mr. Rismiller conducted a review of Mr. Swain's disciplinary history contained in his personnel file.  AF No. 17.1.  Based on Mr. Swain's repeated history of safety, performance and attendance violations (including prior warnings for failing to wear his safety gloves), Mr. Rismiller recommended that

Mr. Swain be terminated.  AF No. 17.2.

Mr. Rismiller's recommendation was assessed by several members of Precision management including Delilah Glover ("Ms. Glover"), Manager of Administration (African-American), Nick Moorman ("Mr. Moorman"), General Manager (Caucasian), and Roslyn Bruns ("Ms. Bruns"), Director of Human Resources for all Precision Plants (Caucasian).  AF No. 18.  The team's assessment of Mr. Rismiller's recommendation consisted of a review of Mr. Swain's disciplinary history and a discussion with Mr. Rismiller regarding his observation of Mr. Swain.  AF No. 19.1.

The fact that Mr. Swain is African-American and is married to a Caucasian woman was never mentioned or discussed during the team's investigation.  AF No. 19.2.  In fact, neither Ms. Bruns nor Mr. Moorman were aware Mr. Swain was involved in an interracial marriage and Ms. Bruns was not even aware that Mr. Swain was African-American.  AF No. 19.3.

Based on Mr. Swain's history of safety, attendance, and performance violations and the seriousness of Mr. Swain's repeated failure to wear safety gloves as required in the coil field, the team accepted Mr. Rismiller's recommendation and the decision was made to terminate Mr. Swain's employment.  AF No. 20.  Mr. Swain was summoned to the Precision plant on October 2, 2009, for a meeting with Mr. Rismiller and Ms. Glover.  AF No. 21.1.  Mr. Swain was informed that the September

30th safety violation had been investigated and Mr. Swain was given the option of resigning.  AF No. 21.2.  After Mr. Swain refused to resign, he was informed that his employment was being terminated based on his documented history of quality, safety and attendance issues.  AF No. 21.3.

Precision has a Peer Review Plan which is a program that, if the employee elects to participate, allows a group of peers from another plant to review the termination decision and determine whether it was appropriate.  AF No. 22.1.  Mr. Swain elected not to participate in the Peer Review Plan.  AF No. 22.2.

Mr. Rismiller never made any derogatory comments to Mr. Swain about his race or his involvement in an interracial marriage.  AF No. 23.1.  None of the other members of the decision-making team, Ms. Bruns, Ms. Glover, or Mr. Moorman, ever made any racially derogatory or discriminatory remarks to Mr. Swain.  AF No. 23.2.

Mr. Swain never reported to anyone in Precision management or human resources that Mr. Rismiller or any other employee discriminated against him, harassed him, threatened him, or made any discriminatory or derogatory remarks to him.  AF No. 24.

## III.   STANDARDS

### A.    Summary Judgment Generally

Summary judgment is proper only when there is no genuine issue of material

fact and the moving party is entitled to judgment as a matter of law.  Fed. R . Civ. P.

56(c).  All reasonable doubts about the facts and all justifiable inferences are resolved

in favor of the nonmovant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th

Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S.

242, 248 (1986).  "Once the moving party has properly supported its motion for

summary judgment, the burden shifts to the nonmoving party to 'come forward with

specific facts showing that there is a genuine issue for trial.'"  *International Stamp*

*Art, Inc. v. U.S. Postal Service*, 456 F.3d 1270, 1274 (11th Cir. 2006) (citing

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

### B.    Employment Discrimination Specifically

A plaintiff in an employment discrimination case maintains the ultimate burden

of proving that the adverse employment decision was made because of intentional

discrimination.  *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133

(2000); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509-12 (1993); *Nix v. WLCY*

*Radio/Rahall Comms.*, 738 F.2d 1181, 1184 (11th Cir. 1984).  Although the Supreme

Court previously established the basic allocation of burdens and order of proof in a

disparate treatment case,  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973);

*Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981); *Desert Palace v.*

9

*Costa*, 539 U.S. 90 (2003), that allocation scheme applies only in cases in which there is no direct evidence of discrimination.  *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 595 (11th Cir. 1987).[4]

Under the *McDonnell Douglas/Burdine* scheme, a plaintiff first has the burden of proving by a preponderance of evidence a *prima facie* case of discrimination. Second, once the plaintiff proves a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision.  Finally, if the defendant carries its burden, the plaintiff must *either* prove by a preponderance of the evidence that the legitimate reasons offered by the defendant are merely a pretext for discrimination *or* present sufficient evidence, of any type, for a reasonable jury to conclude that discrimination was a "motivating factor" for the employment action, even though the defendant's legitimate reason may also be true or have played some role in the decision. *McDonnell Douglas*, 411 U.S. at 802-05; *Burdine*, 450 U.S. at 252-54; *Desert Palace*,

---

[4] As the Eleventh Circuit has explained, "only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age, . . . constitute direct evidence of discrimination." *Carter v. City of Miami*, 870 F.2d 578, 782 (11th Cir. 1989) (footnote omitted).  Based upon this standard and in the absence of a record of <u>any</u> invidiously-charged utterances by an employee involved in the decision-making process, Mr. Swain's discrimination claim is purely a circumstantial evidence one.  (*See* Doc. 22 at 6-7 (setting forth framework for establishing a circumstantial evidence of race discrimination.)).

539 U.S. at 101-02.

## IV.   ANALYSIS

### A.   The Hearsay Motion

In its Hearsay Motion, Precision seeks "to strike Paragraph 9 from [Mr.] Swain's 'Statement of Facts' in his Response Brief." (Doc. 24 at 2). Paragraph 9 states: "Defendant's Plant Manager began receiving false allegations from another white employee (Mr. Stephen Goodson) concerning Plaintiff." (Doc. 22 ¶ 9). In setting forth this fact, Mr. Swain has not pointed to any evidence in the record that supports it.

Mr. Swain confirmed during his deposition that he never actually heard Mr. Goodson speaking to Mr. Rismiller about him. (Doc. 21 at Ex. 1 at 26). Precision has indicated that "[t]he only record evidence that Goodson ever spoke to Rismiller about Swain comes in the form of inadmissible double hearsay evidence. Specifically, Swain testified that another employee named 'Eddie' informed Swain that Goodson had told him that he (Goodson) went and 'told on' Swain to Rismiller." (Doc. 24 at 2); (*see also* Doc. 21 at Ex. 1 at 24-25).

Hearsay is defined under the Federal Rules of Evidence as:

[A] statement that:

> (1)   the declarant does not make while testifying at the

current trial or hearing; and

(2)   a party offers in evidence to prove the truth of the matter asserted in the statement.

Fed. R. Evid. 801(c).

The court agrees with Precision that the deposition testimony arguably relied upon by Mr. Swain to support paragraph 9 contains an inadmissible layering of hearsay and that no exceptions apply.  Accordingly, the Hearsay Motion is due to be granted, and paragraph 9 is due to be stricken.

**B.    Rule 56 Motion**[5]

**1.    Race Discrimination**

**a.    *Prima Facie* Case**

To support a circumstantial discrimination claim:

[T]he plaintiff must show that: (1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) her employer treated similarly situated employees outside of her protected class more favorably than she was treated; and (4) she was qualified to do the job.

*Burke-Fowler v. Orange County, Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006).

---

[5] Consistent with *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998), the court addresses Mr. Swain's Title VII claims with the understanding that the same analysis applies to the § 1981 ones because both statutes "have the same requirements of proof and use the same analytical framework."  Also, neither side has suggested that the court should utilize an alternative model when analyzing Mr. Swain's § 1981 claims.

Mr. Swain's case *prima facially* fails because he cannot support the third prong identified above. Specifically, he has not identified a suitable comparator with a nearly identical pattern of misconduct who received more favorable treatment by Precision than he did. *See Maniccia v. Brown*, 171 F.3d 1364 (11th Cir. 1999) ("We require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges.").

To the extent that Mr. Swain contends that Brian West ("Mr. West") fits the comparator role, the court rejects such a position because Mr. West's record prior to the safety glove safety violation on May 12, 2009, included only a written warning for a spilled safety incident on June 27, 2008, and a verbal warning for a quality violation on February 20, 2007. (Doc. 20 at 13). Mr. Swain's glove infraction, on the other hand, was preceded by four verbal warnings (including several for not wearing gloves), two written warnings, one suspension, and placement upon both a performance improvement and an attendance improvement plan. (*Id.* at 13-14). Thus, Mr. West and Mr. Swain are not similarly situated, and Mr. Swain cannot demonstrate a *prima facie* case of race discrimination.

### b.   Lack of Pretext

Alternatively, assuming that Mr. Swain has established a *prima facie* case, his

wrongful termination claim still fails because he lacks any evidence of pretext with respect to Precision's articulated reason for firing him–his record of repeated safety, performance, and attendance infractions.  (Doc. 20 at 17).  Once a defendant has articulated "a legitimate, non-discriminatory reason for its employment action. . . . [t]hen the plaintiff must prove that the reason provided by the defendant is a pretext for unlawful discrimination." *Burke-Fowler*, 447 F.3d at 1323 (citation omitted).

In determining the issue of pretext, "[t]he district court must evaluate whether the plaintiff has demonstrated 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (citations omitted).  In this instance, the court determines that the record lacks "'evidence of such quality and weight that reasonable and fairminded men in the exercise of impartial judgment might reach different conclusions.'" *See MacPherson v. Univ. of Montevallo*, 922 F.2d 766, 776 (11th Cir. 1991) (quoting *Verbraeken v. Westinghouse Elec. Corp.*, 881 F.2d 1041, 1045 (11th Cir. 1998)).  In sum and as elaborated upon below, Mr. Swain has failed to adduce sufficient evidence for a reasonable jury to conclude that his race was the real reason behind Precision's decision to fire him.

To the extent that Mr. Swain relies upon evidence of his interracial marriage

as a basis for pretext, there is a temporal disconnect to his argument as he acknowledges that Mr. Rismiller became aware of his interracial marriage in June 2006 at a company picnic and yet Mr. Swain was not fired until a full three years later. *Cf. Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (explaining in context of Title VII retaliation claim that "three (3) month period, without more, does not rise to the level of 'very close.'" (citing *Clark Cnty, School Dist. v. Breeden*, 532 U.S. 268, 273, 121 S. Ct. 1508, 1511, 149 L. Ed. 2d 509 (2001))).

Additionally, Mr. Rismiller was not the only person involved in the decision to fire Mr. Swain.  Instead, he was the person who made a recommendation to take that action, which was then undisputedly reviewed by a separate three member team (*i.e.*, Ms. Glover,  Ms. Bruns and Mr. Moorman) for approval.  Two members (*i.e.*, Ms. Bruns and Mr. Moorman) had no knowledge of Mr. Swain's interracial marriage, and in fact Ms. Bruns did not even know Mr. Swain's race at the time of the challenged decision.  (Doc. 20 at 16).

Also, Mr. Swain does not point to racially-charged utterances by any of the team members and admits that his marriage was neither an item mentioned nor discussed during the team's deliberative process.  In sum, there simply is no evidence to substantiate that the team's decision to accept Mr. Rismiller's recommendation to

fire Mr. Swain turned upon his race generally or his interracial marriage specifically.

In opposing the Rule 56 Motion, Mr. Swain also suggests that his supervisor, Mr. Jenkins, conspiring with Mr. Rismiller, set him up for the glove incident. (Doc. 22 at 7-8). Assuming the truth of this position, the court concludes that such proof is insufficient to show pretext for several reasons.

First, Mr. Swain has not linked such a conspiratorial set up to either his race or his interracial marriage. Second, there is nothing in the record to suggest that the decision-making team (*i.e.*, Ms. Glover, Ms. Bruns and Mr. Moorman) knew or had reason to believe that Mr. Jenkins and Mr. Rismiller had conspired to make sure Mr. Swain did not put on his gloves.

Third, Precision's decision to discharge Mr. Swain was not based solely upon the glove incident, but rather included the weight of Mr. Swain's extensive preexisting disciplinary record, which evidence Mr. Swain has not disputed. *See Herawi v. Ala. Dept. of Forensic Sciences*, 311 F. Supp. 2d 1335, 1346 (M.D. Ala. 2004) ("*McDonnell Douglas* forces a defendant, where the *prima-facie-*case threshold is met, to articulate each and every reason for its action and then required a plaintiff to show why each reason is a pretext for impermissible discrimination."). As such, Mr. Swain has not adduced sufficient evidence by which a reasonable jury could conclude that Precision's rationale for firing Mr. Swain was pretext for race

16

discrimination.

As the Supreme Court has succinctly stated regarding a plaintiff's attempt to effectively discredit an employer's explanation for an employment action in the context of a Rule 50 motion:

> Thus, a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.
>
> This is not to say that such a showing by the plaintiff will *always* be adequate to sustain a jury's finding of liability. Certainly there will be instances where, although the plaintiff has established a *prima facie* case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, non-discriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.

*Reeves*, 530 U.S. at 148, 120 S. Ct. at 2109. Therefore, despite a plaintiff's efforts to demonstrate an issue of fact regarding the truthfulness of an employer's asserted justification for an adverse employment decision, judgment as a matter of law in favor of the employer would still be appropriate if the record: 1) conclusively demonstrates some other, non-discriminatory basis for the decision; or 2) reveals only a weak issue of fact coupled with plentiful evidence that no illegal discrimination took place.

Here, to the extent that Mr. Swain's opposition reveals an issue of fact

regarding the truthfulness behind Precision's decision to fire him, it is, at best, only a weak one, and the record is otherwise replete with convincing evidence that no illegal discrimination occurred.  Accordingly and consistent with the Supreme Court's discussion in *Reeves*, no reasonable jury could reach a verdict in Mr. Swain's favor, and summary judgment is due to be granted in favor of Precision on his discriminatory discharge claim.

### 2.    Racial Harassment

Mr. Swain also opposes summary judgment on his racial harassment claim premised upon a hostile working environment.   As the Eleventh Circuit has explained:

> A hostile work environment claim under Title VII is established upon proof that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."   This court has repeatedly instructed that a plaintiff wishing to establish a hostile work environment claim show: (1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee, such as national origin; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.

*Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).

In opposing the Rule 56 Motion, Mr. Swain bases his hostile work environment

theory on the actions of Mr. Rismiller.  (*See* Doc. 22 at 8 ("After presentation via live testimony with all things considered in the proper context, a fact finder could reasonably find that Mr. Rismiller did engage in discriminatory actions; thus, creating a hostile environment."); *id.* at 9 ("Further, Mr. Rismiller's conduct taken as a whole over the three years after he found out about [Mr. Swain]'s interracial marriage created a hostile work environment, and perpetuated a systematic scheme to remove [Mr. Swain]")).

More specifically, Mr. Swain testified during his deposition that he got "stares" from Mr. Rismiller at a picnic in 2006 and felt offended by them.  (Doc. 21 at Ex. 1 at 20-21).  Mr. Swain also described the looks he received by Mr. Rismiller as ones of "disgust" and "like he couldn't stand me." (*Id.* at 30, 31).  Mr. Swain theorized that Mr. Rismiller's treatment of him was related to his interracial marriage although Mr. Rismiller never verbally said anything to him about it.  (*Id.* at 22).

Mr. Swain also testified that Mr. Rismiller threatened him on occasion.  In the first example, Mr. Rismiller "came out from the office and stopped [him] on the forklift and told [him] [he] wasn't Precision Strip material, and [indicated that] he [was] going to fire [him] if [he] [did] [not] straighten up." (*Id.*).

In the second one that Mr. Swain could recall, Mr. Rismiller asked him "'why [his] attitude ha[d] been so poor lately?'" (*Id.* at 26).  Mr. Swain responded that he

had been under a lot of stress related to his sick brother.  (*Id.*).  According to Mr. Swain, Mr. Rismiller then retorted that he "'hate[d] to be a dick, but [he] [did]n't care" and that if Mr. Swain did not "straighten up" then he was "going to fire" him. (*Id.*).  Mr. Swain reported neither one of these incidents.  (*Id.* at 27).

Considering the totality of the circumstances, and assuming without deciding that Mr. Swain subjectively perceived Mr. Rismiller's actions "as sufficiently severe and pervasive to alter the terms or conditions of [his] employment," such evidence still fails to meet the objective component of the claim.  *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999).  More specifically, from "the perspective of a reasonable person in [Mr. Swain]'s position," because the challenged conduct of Mr. Rismiller lacks a sufficient level of frequency, severity, physicality, or humiliation, and does not constitute an unreasonable interference with Mr. Swain's ability to work, the court concludes that Mr. Swain has not shown "a minimum level of severity or pervasiveness necessary for harassing conduct to constitute discrimination in violation of Title VII."  *Mendoza*, 195 F.3d at 1246.  Therefore, Precision's Rule 56 Motion also is due to be granted on Mr. Swain's racial harassment claim.[6]

---

[6]  The court acknowledges that Mr. Swain testified during his deposition that his co-worker, Mr. Goodson, commented about not knowing his "wife was white" and said that he was going "to tell [his] boys." (Doc. 21 at Ex. 1 at 19).  Further, when Mr. Swain asked who were his boys, Mr. Goodson responded "The Ku Klux Klan." (*Id.* at 20).  In his brief, Mr. Swain has abandoned this evidence as a basis for

## V.    CONCLUSION

Accordingly, for the reasons explained above, Precision's Hearsay Motion and its Rule 56 Motion are both due to be granted.  The court will enter a separate order.

**DONE** and **ORDERED** this the 7th day of March, 2012.

_____
**VIRGINIA EMERSON HOPKINS**
United States District Judge

---

opposing summary judgment.  However, even when considering it, the proof fails to substantiate a hostile work environment claim premised upon a co-employee's harassing behavior because this one time incident is not sufficiently severe or pervasive to satisfy the objective standard as articulated in *Mendoza*.  Also, as Mr. Swain never reported the incident, he cannot demonstrate that Precision had actual notice of the purported harassment.  Finally, constructive notice is lacking because a non-physical exchange that occurred only one time is not "so severe and pervasive that management should have known of it."  *Miller*, 277 F.3d at 1278.